

# In the
# Missouri Court of Appeals
## Western District

IN RE TRENTON FARMS RE, LLC,   )
PERMIT NO. MOGS10520;   )
MISSOURI DEPARTMENT OF   )    WD81385
NATURAL RESOURCES AND   )
MISSOURI CLEAN WATER   )    OPINION FILED: January 2, 2019
COMMISSION,   )
  )
      Respondents,   )
  )
v.   )
  )
HICKORY NEIGHBORS UNITED,   )
INC.,   )
  )
      Appellant.   )

**Appeal from the Administrative Hearing Commission**

Before Division Three: Gary D. Witt, Presiding Judge, Cynthia L. Martin, Judge and
Anthony Rex Gabbert, Judge

Hickory Neighbors United, Inc. ("Hickory Neighbors") seeks judicial review of the

decision of the Missouri Clean Water Commission ("CWC") to approve a permit

application filed by Trenton Farms RE, LLC ("Trenton Farms") for a swine concentrated

animal feeding operation ("CAFO") in Grundy County, Missouri. Hickory Neighbors

argues that because manure storage structures would be located in the Federal Emergency

Management Agency ("FEMA") Zone A 100-year floodplain, it was error as a matter of law to approve the permit. Hickory Neighbors also argues that certain commissioners on the CWC were unconstitutionally or unlawfully appointed, or had conflicts of interest precluding them from participating in the permit approval process. Finally, Hickory Neighbors argues that the CWC abused its discretion in denying its request for a continuance. Finding no error, we affirm.

## Factual and Procedural Background

The Missouri Clean Water Law, section 644.006, *et. seq.*,[1] describes Missouri's policy objectives with respect to conserving, protecting, and maintaining public water supplies, while maintaining employment and industrial development in the state. Section 644.011. Implementation of the Clean Water Law is vested in the CWC and the Missouri Department of Natural Resources ("DNR"). Section 640.010; section 644.026. Though the CWC "retain[s] all rulemaking and hearing powers allotted by law," section 640.010.3, the CWC is assigned to, and is considered domiciled with, DNR. *Id*.; section 644.021.1.

Pursuant to section 640.710.1, DNR has the authority to promulgate rules regulating CAFOs. In accordance with regulations promulgated for that purpose, DNR reviews CAFO applications to determine permit eligibility. 10 CSR 20-6.010(2).[2]

On November 23, 2016,[3] DNR issued Trenton Farms an operating permit for a CAFO in Grundy County, Missouri. Hickory Neighbors appealed DNR's issuance of this

---

[1]All statutory references are to RSMo 2016 unless otherwise noted.

[2]All regulatory references to 10 CSR 20-6 are to the Missouri Code of State Regulations (2012) unless otherwise indicated.

[3]On November 22, 2016, this court handed down its opinion in *In the Matter of Trenton Farms RE, LLC v. Missouri Department of Natural Resources*, 504 S.W.3d 157 (Mo. App. W.D. 2016). In that case, we affirmed the

2

permit to the Administrative Hearing Commission ("AHC") as authorized by section 621.250 and 640.013. Trenton Farms was granted leave to intervene in the appeal.

As required by section 621.250, the AHC conducted a hearing over several days to consider Hickory Neighbors' appeal, pursuant to contested case procedures described in sections 536.063 through 536.090 of the Missouri Administrative Procedure Act ("MAPA"). DNR bore the burden of proof in the proceeding before the AHC as the party defending the issuance of the CAFO permit. Section 640.012.

On August 31, 2017, the AHC issued a recommended decision, with findings of fact and conclusions of law. The AHC found that DNR sustained its burden of proof to establish that a CAFO permit was issued to Trenton Farms in accordance with current law and regulations. The evidence and testimony presented to the AHC, and the AHC's findings of fact and conclusions of law, will be addressed in more detail as necessary in considering Hickory Neighbors' points on appeal.

Once the AHC issued its recommended decision, the CWC was charged with the obligation to "issue its own decision, based on the appeal, for permit issuance, denial, or any condition of the permit." Section 644.051.6; *see also* section 621.250.3. In doing so, the CWC was not obligated to issue its own decision with findings of fact and conclusions of law unless it decided to "change[] a finding of fact or conclusion of law made by the

CWC's refusal to accept the recommendation of the AHC to approve a CAFO permit issued by DNR. *Id*. at 163. The CWC's refusal was based on the fact that Trenton Farms' permit application did not meet the requirements of 10 CSR 20-8.300(5)(A), (now numbered 10 CSR 20-8.300(4)(A)), as there was insufficient evidence in the record to demonstrate that manure storage areas would be protected from inundation or damage due to the 100-year flood. *Id*. at 160-63. We noted in our Opinion that Trenton Farms retained the continued right to seek a CAFO permit from DNR. *Id*. at 163.

[AHC], or [to] modif[y] or vacate[] the decision recommended by the [AHC]." Section 644.051.6.

The AHC's recommended decision was placed on the CWC's December 6, 2017 meeting agenda. On December 5, 2017, three new commissioners were appointed to the CWC. The CWC thus rescheduled consideration of the AHC's recommended decision to its December 12, 2017 meeting agenda. On December 9, 2017, Hickory Neighbors filed a motion for continuance of the CWC's consideration of the AHC's recommended decision. On December 11, 2017, Hickory Neighbors filed a motion to disqualify three commissioners, (Commissioners Hurst, Coday and Kleiboeker). The motion to disqualify argued that the commissioners were subject to the same standards for impartiality applicable to judges, and that the commissioners had appearances of conflicts of interest that required their recusal.

On December 12, 2017, the CWC denied Hickory Neighbors' motions for a continuance and to disqualify commissioners based on appearances of conflicts of interest. The CWC then voted to accept the AHC's recommended decision, subject to minor handwritten interlineated changes to correct scrivener errors. [ROA pp. 1760-61]. The CWC thus sustained DNR's November 23, 2016 decision to issue a permit to Trenton Farms. The CWC's vote was reflected by the signature of four commissioners[4] on the

---

[4]The four commissioners who voted to accept the AHC's recommended decision were Commissioners McCarty, Coday, Reece, and Thomas. The two other commissioners on the CWC at the time (Commissioners Hurst and Kleiboeker) either recused themselves from considering the matter, or were no longer participating in the hearing at the time of the vote. At the time of the vote, one position on the CWC remained vacant.

4

AHC's recommended decision, which the CWC adopted as its own, subject to the approved handwritten interlineations. Section 644.051.6.

Pursuant to section 644.051.6, this Court possesses original jurisdiction over judicial review of the CWC's decision pursuant to the procedures for judicial review described in chapter 536 of the MAPA. Hickory Neighbors timely filed its request for judicial review from the CWC's decision on January 10, 2018.

## Standard of Review

On judicial review of an administrative action pursuant to chapter 536, this court is directed to determine the matter "upon the petition and record filed." Section 536.140.1.

> The inquiry may extend to a determination of whether the action of the agency
>
> (1)    Is in violation of constitutional provisions;
> (2)    Is in excess of the statutory authority or jurisdiction of the agency;
> (3)    Is unsupported by competent and substantial evidence upon the whole record;
> (4)    Is, for any other reason, unauthorized by law;
> (5)    Is made upon unlawful procedure or without a fair trial;
> (6)    Is arbitrary, capricious or unreasonable;
> (7)    Involves an abuse of discretion.

Section 536.140.2. We are to "render [an opinion] affirming, reversing, or modifying the agency's order, and may order the reconsideration of the case in the light of the court's opinion . . . , and may order the agency to take such further action as it may be proper to require; but the court shall not substitute its discretion for discretion legally vested in the agency, unless the court determines that the agency decision was arbitrary or capricious." Section 536.140.5.

5

**Analysis**

Hickory Neighbors asserts five points on appeal. Hickory Neighbors challenges the CWC's legal authority to approve a CAFO permit where manure storage structures will be located within the FEMA Zone A 100-year floodplain boundary; challenges the lawfulness of the CWC's decision because several commissioners were appointed to the CWC pursuant to an allegedly unconstitutional version of section 644.021; challenges the lawfulness of the CWC's decision because several commissioners were unlawfully appointed to the CWC pursuant to an earlier version of section 644.021; argues that the CWC erroneously denied Hickory Neighbors' motion for a continuance; and argues that the CWC erroneously denied Hickory Neighbors' motion to disqualify several commissioners based on alleged conflicts of interest.

**Point One**

In its first point on appeal, Hickory Neighbors challenges the CWC's legal authority to approve the CAFO permit issued by DNR to Trenton Farms because some manure storage facilities will be located within the FEMA Zone A 100-year floodplain boundary. Hickory Neighbors alleges that this renders the CAFO ineligible for a permit as a matter of law pursuant to 10 CSR 20-8.300(4).[5]

---

[5]All regulatory references to 10 CSR 20-8 are to the Missouri Code of State Regulations (2016) unless otherwise indicated. Hickory Neighbors' petition appealing to the AHC, and its Brief in this Court, refer to 10 CSR 20-8.300(5). However, the AHC's recommended decision refers to 10 CSR 20-8.300(4). The discrepancy is explained by the fact that 10 CSR 20-8.300(5) was renumbered to 10 CSR 20-8.300(4) when 10 CSR 20-8.300 was amended in 2016, though the text of the subsection was not modified insofar as is relevant to this appeal. We refer to 10 CSR 20-8.300(4) and not to 10 CSR 20-8.300(5) in this Opinion.

6

10 CSR 20-8.300 describes manure storage design regulations to be used "as a guide for the design of animal waste management systems at [CAFOs]." According to the purpose statement, the regulation describes "minimum requirements" with respect to the adequacy of manure storage design, although "[d]eviation from the[] minimum requirements will be allowed where sufficient documentation is presented to justify the deviation." 10 CSR 20-8.300.

10 CSR 20-8.300(4) addresses the location of manure storage structures. Relevant to this case, 10 CSR 20-8.300(4)(A) provides:

> Protection from Flooding—Manure storage structures, confinement buildings, open lots, composting pads, and other manure storage areas in the production area shall be protected from inundation or damage due to the one hundred- (100-) year flood.

It is uncontested, and the AHC's recommended decision found, that some of Trenton Farms' manure storage structures will be within the 100-year floodplain boundary as designated by FEMA. The AHC nonetheless found that the manure storage structures are protected from inundation or damage due to the 100-year flood because the buildings will be ***above*** the 100-year base flood elevation.

The AHC based this finding on the fact that FEMA floodplain boundary lines do not reflect, nor take into consideration, elevations and land contours. The AHC cited to the testimony of John Holmes ("Holmes"), a professional engineer with expertise in determining base flood level elevations. Using software employed by the Army Corps of Engineers, along with site surveys of elevations and cross sections and other relevant data, Holmes was able to model the floodplain on the Trenton Farms' site to calculate base

elevations of a 100-year flood. Holmes also analyzed the hydrological impact of flood waters that might cause erosion of berms on the site. Holmes found that the Trenton Farms' site would be protected from inundation or damage from a 100-year flood because the elevation of the manure storage structures would be above the base flood level elevations, and because the water flow of flood waters in the area would be of low velocity, negating erosion concerns. The AHC found that based on Holmes's calculations, the project engineer for Trenton Farms certified that the CAFO site would be protected from inundation and damage from a 100-year flood.

The AHC also relied on the testimony of Paul H. Reiz ("Reiz"), a professional engineer and certified floodplain manager who testified on behalf of Hickory Neighbors. Reiz agreed that there is at least three feet of freeboard, or area, between 100-year base flood elevations and the manure storage structures on the Trenton Farms' site. Reiz also agreed that any erosion from flood waters in the area would be minimal, because the width of the floodplain at the CAFO site would yield low-water velocities.

Based on this, and other related evidence, the AHC concluded that even though manure storage structures on the Trenton Farms' site would be *within* the horizontal FEMA 100-year floodplain boundaries, the structures would nonetheless be protected from inundation and damage from a 100-year flood because they would be *above* the base flood level elevation.

> [T]aking into account the base flood elevations of the 100-year floodplain, the worst case scenario is that flood elevation is 744.35', without any fill, of the principal building sites. This base flood elevation is 13.5' [below] [sic] any opening in the CAFO buildings, plus or minus a foot. The lowest proposed pit of any CAFO building, the gestation barn, is 3.5' above the base

8

flood elevation.  ***Therefore, all of the proposed buildings are above the base flood elevation, even though located in the area mapped by Holmes as within the boundary lines of FEMA map Zone A***.

[ROA pp. 1788-89] (emphasis added).  The AHC further found that Trenton Farms intended to build its manure storage structure upon berms or fill as to raise the elevation of the structures even further, thus diverting the base flood elevations.  [ROA p. 1789].  The AHC found that low water velocities and shallow floodplain slopes on the CAFO site would negate any risk of erosion of the berms of fill beneath the manure storage structures during a 100-year flood event.  [ROA p. 1789].

Hickory Neighbors does not challenge the AHC's findings.  Specifically, Hickory Neighbors does not contest the AHC's conclusion that if base flood level elevations and water velocity are taken into consideration, the Trenton Farms CAFO site is protected from inundation or damage due to a 100-year flood.[6]  Instead, Hickory Neighbors argues that these findings are irrelevant because 10 CSR 20-8.300(4)(A) absolutely prohibits manure storage buildings from being constructed ***within*** the FEMA 100-year floodplain boundary.

The plain language of 10 CSR 20-8.300(4)(A) belies Hickory Neighbors' argument.  Though the regulation states that manure storage structures must be protected from inundation or damage during a 100-year flood event, the regulation does not state that the only means of protecting structures from inundation or damage is by prohibiting their construction within the FEMA 100-year flood plain boundary.[7]  In fact, use of the phrase

---

[6]During oral argument, Hickory Neighbors challenged for the first time the legal sufficiency of professional engineering certifications relied on by the AHC to make its findings.  This issue is not preserved for our review as it exceeds the scope of the point relied on.

[7]As such, Hickory Neighbors' argument that Trenton Farms was bound to secure from FEMA either an official Letter of Map Revision ("LOMR") or a Conditional Letter of Map Revision ("CLOMR") to alter the FEMA

"or damage" plainly suggests that the regulation authorizes the placement of manure storage structures within flood boundaries, so long as appropriate measures are taken to protect the structures from damage.

Undeterred, Hickory Neighbors argues that the plain language of 10 CSR 20-8.300(4)(A) must be read in conjunction with DNR Publication 915, and that a combined reading of both constrains construction of the regulation. We disagree.

Publication 915 states that "[a]nimal waste structures must be located above the 100-year flood level." The AHC concluded that DNR Publication 915 is not an officially adopted publication of the CWC; is no longer found on the DNR website though it is available on request; has been replaced by a newer publication, Publication 2351; and that neither publication was relied on by DNR when it decided to issue the CAFO permit to Trenton Farms. [ROA pp. 1782-83; 1796]. As such, the AHC concluded that "Publication 915 has no binding effect and is not an interpretation of [10 CSR 20-8.300(4)(A)]." [ROA p. 1796]. Though Hickory Neighbors argues that Publication 915 has not been officially withdrawn by DNR, it offers no argument contesting the AHC's conclusion that whether or not the publication has been withdrawn, Publication 915 is of no binding relevance as it is not an interpretation of 10 CSR 20-8.300(4)(A).

Even were Publication 915 of binding relevance, (which it is not), its plain language does not support Hickory Neighbors' claim that the publication constrains interpretation of 10 CSR 20-8.300(4)(A). Publication 915 does not prohibit the placement of manure

---

100-year flood plain boundaries is without merit. Though the FEMA 100-year flood plain boundaries are relevant, they are not controlling. The issue is whether, if structures are within those boundaries, they are nonetheless protected from inundation or damage.

storage structures *within* the 100-year floodplain boundary, and instead states only that such structures must be *above* the 100-year floodplain. The plain and ordinary meaning of the word "above" is "overhead," or "over or higher than." *Above*, THE AMERICAN HERITAGE COLLEGE DICTIONARY 4 (3d ed. 1993). "Above" thus refers to one subject's *vertical* relationship to another subject. Employing the plain meaning of "above," Publication 915 thus does not prohibit construction of manure storage structures within *horizontal* 100-year floodplain boundaries. Instead, Publication 915 requires manure storage structures to be placed at an elevation that is *above* 100-year floodplain levels. As the AHC found, and as Hickory Neighbors concedes, FEMA 100-year floodplain boundaries depict relationships on a horizontal plain without regard to vertical contours or elevations. We cannot conclude, therefore, that Publication 915 prohibits the placement of manure storage structures within the horizontal boundaries of the FEMA 100-year floodplain, or that the publication constrains construction of 10 CSR 20-8.300(4)(A).

In summary, the AHC's findings that the Trenton Farms CAFO buildings are protected from inundation or damage during a 100-year flood event because their elevation is above the base flood level elevation, and because low water velocity will negate erosion concerns, are unchallenged, and are legally sufficient to establish compliance with 10 CSR 20-8.300(4)(A). The CWC did not exceed its legal authority when it accepted the AHC's recommended decision sustaining DNR's issuance of a permit to Trenton Farms.

Point One is denied.

11

**Point Two**

In its second point on appeal, Hickory Neighbors alleges that section 644.021.1 as amended effective October 14, 2016 is unconstitutional because it violates Article III, sections 21 and 23 of the Missouri Constitution.[8] Hickory Neighbors thus contends that the CWC's decision to accept the AHC's recommended decision cannot be enforced, because four commissioners (Commissioners Hurst, Coday, Thomas, and Kleiboeker)[9] were appointed to the CWC pursuant to an unconstitutional statute.

Prior to its amendment in 2016, section 644.021.1 required the CWC to be comprised of seven members, two (but no more than two) of whom shall be knowledgeable "concerning the needs of agriculture, industry or mining" and interested in protecting those needs; one of whom shall be knowledgeable of the "needs of publicly owned wastewater treatment works"; and four of whom shall represent the public. By amendment effective October 16, 2016, the authorized composition of the CWC was changed to provide that "at least two members" shall be knowledgeable "concerning the needs of agriculture, industry or mining" and interested in protecting those needs; and that "no more than four members" shall represent the public.[10] Hickory Neighbors argues that this amendment was unconstitutional; that commissioners appointed pursuant to the amended statute were not

---

[8]Article III, section 21 of the Missouri Constitution addresses the power of each house of the General Assembly to originate or amend bills. Article III, section 23 of the Missouri Constitution addresses the prohibition against bills containing more than one subject.

[9]Commissioner Hurst was appointed to the CWC in October 2017. Commissioners Coday, Kleiboeker and Thomas were appointed to the CWC on December 5, 2017. Commissioners Hurst and Kleiboeker did not participate in the CWC's decision to accept the AHC's recommended decision sustaining issuance of a permit to Trenton Farms. Commissioners Coday and Thomas did participate in the decision, and were two of the four Commissioners who voted to accept the AHC's recommended decision.

[10]The requirement that one member be knowledgeable of the "needs of publicly owned wastewater treatment works" was not changed by the 2016 amendment. Section 644.021.1.

12

lawfully serving on the CWC; and that commissioners were required to be appointed to the CWC pursuant to the pre-2016 amendment version of section 644.021.1.

Though Hickory Neighbors' point on appeal is framed as a challenge to the constitutionality of section 644.021.1 as amended,[11] in reality, Hickory Neighbors is asking this court to find that commissioners appointed pursuant to section 644.021.1 as amended were serving on the CWC unlawfully, rendering the CWC's decision to accept the AHC's recommended decision unenforceable. Hickory Neighbors does not have the authority to assert this claim.

"[T]he proper method for challenging the constitutional validity of a [commissioner's] service is through a *quo warranto* action." *Benne v. ABB Power T & D Co.*, 106 S.W.3d 595, 598 (Mo. App. W.D. 2003). Section 531.010 provides:

> In case any person shall usurp, intrude into or unlawfully hold or execute any office or franchise, the attorney general of the state, or any circuit or prosecuting attorney of the county in which the action is commenced, shall exhibit to the circuit court, or other court having concurrent jurisdiction therewith in civil cases, an information in the nature of a quo warranto, at the relation of any person desiring to prosecute the same[.]

Quo warranto "is not to be used to prevent an improper exercise of power lawfully possessed," and instead is to be used "solely to prevent an officer or corporation of persons

---

[11]Exclusive *appellate* jurisdiction in all cases involving the validity of a statute is vested by Article V, section 3 of the Missouri Constitution with the Supreme Court of Missouri. However, the Supreme Court's "exclusive appellate jurisdiction is not invoked simply because a case involves a constitutional issue." *McNeal v. McNeal-Sydnor*, 472 S.W.3d 194, 195 (Mo. banc 2015). After Hickory Neighbors sought judicial review of the CWC's decision in this court, the case was transferred to the Supreme Court in light of Hickory Neighbors' challenge to the constitutionality of section 644.021 as amended in 2016. On May 14, 2018, the Missouri Supreme Court retransferred this matter because, pursuant to section 644.051.6, *original* jurisdiction to conduct judicial review pursuant to chapter 536, and not appellate jurisdiction, lies with this court. The Supreme Court's retransfer order thus differentiated between an appellate court's exercise of original jurisdiction to conduct judicial review as directed by a statute, and the exercise of traditional appellate jurisdiction as directed by Article III of the Missouri Constitution.

13

purporting to act as such from usurping a power which they do not have." *State ex inf. Dykhouse v. City of Columbia*, 509 S.W.3d 140, 151 (Mo. App. W.D. 2017) (quoting *State ex inf. McKittrick v. Murphy*, 148 S.W.2d 527, 530 (Mo. 1941)).

Here, Hickory Neighbors is seeking to prevent commissioners from usurping a power they are alleged not to have. Hickory Neighbors' claim that commissioners could not lawfully act because they were appointed pursuant to an unconstitutional statute is tantamount to a quo warranto action. However, "[a] private party can never proceed in a quo warranto suit in his own name without the interposition of a proper state official." *State ex rel. City of O'Fallon v. Collier Building Corp.*, 726 S.W.2d 339, 340 (Mo. App. E.D. 1986) (citing *State ex rel. Black v. Taylor*, 106 S.W. 1023, 1026-27 (Mo. 1907)). Instead, proceedings in quo warranto must "be brought in the name of the State of Missouri." Rule 98.02(a). And the relator in a quo warranto action may ***only*** be the attorney general or a prosecuting or county counselor of this state, upon personal information (*i.e.* State of Missouri, *ex. inf.* state official), or at the relation of any person who has a special interest in the subject matter of the action (*i.e.* State of Missouri, *ex inf.* state official, *ex rel.* John Doe). Rule 98.02(b). That is because "[q]uo warranto proceedings . . . are an exercise of the police power of the state . . . [that] cannot be delegated to private persons." *State ex inf. Dykhouse*, 509 S.W.3d at 149 (citing *State ex rel. Rouveyrol v. Donnelly*, 285 S.W.2d 669, 674 (Mo. 1956)). "The restriction on private plaintiffs is designed to prevent the harassment of public officials at the whim of private citizens." *Dryer v. Klinghammer*, 832 S.W.2d 3, 4 (Mo. App. E.D. 1992) (citing *State ex inf. Graham v. Hurley*, 540 S.W.2d 20, 23 (Mo. banc 1976)).

14

As a private party, Hickory Neighbors has no authority to initiate a quo warranto action. *State ex rel. Dykhouse*, 509 S.W.3d at 149 ("[T]o invoke the jurisdiction of the . . . court to decide a quo warranto action, the relator filing the petition must have the authority to do so at the outset of the proceedings."). Hickory Neighbors cannot obfuscate its lack of authority to initiate a quo warranto action challenging whether service of commissioners on the CWC is lawful under the guise of challenging the constitutionality of the statute pursuant to which the commissioners were appointed. *Id.* (citing *Lee v. Jamison*, 338 S.W.3d 844, 846 (Mo. App. E.D. 2011) (holding that "[t]he lower court lacked jurisdiction to hear th[e] case because it was filed without proper authority"); *see also Benne*, 106 S.W.3d at 598 (holding proper method to challenge whether a commissioner was lawfully serving on the Labor and Industrial Relations Board was through a quo warranto action); *Dryer*, 832 S.W.2d at 4 (holding that private party did not have standing[12] to pursue an action seeking to remove the director of a fire district).

Even if Hickory Neighbors had the authority to privately challenge the lawfulness of appointments to the CWC (which it does not), the *de facto* doctrine would likely deny Hickory Neighbors the relief it ultimately seeks–a determination that the CWC's decision to accept the AHC's recommended decision is unenforceable.

> The *de facto* doctrine is a long standing rule to the effect that when an individual holds an office under a cloud as to current qualifications for the office, the acts of that officer are not invalid as to third persons and the public. *Boggess v. Pence*, 321 S.W.2d 667, 671-72 (Mo. banc 1959); *In re F— C—*,

---

[12]*State ex inf. Dykhouse*, 509 S.W.3d at 147-48 notes that "the concept of 'standing' differs slightly from the purpose of Rule 98.02," as standing addresses whether a party had a personal interest at stake in a dispute (a substantive matter), while Rule 98.02 addresses the authority or qualification to bring a suit (a procedural matter). Whether Hickory Neighbors' lack of authority to challenge the lawfulness of service of commissioners on the CWC is referred to as a substantive standing issue or as a question of procedural authority, the outcome here is the same.

484 S.W.2d 21, 24-25 (Mo. App. 1972). The doctrine is founded on the societal need for stability arising from confidence in the acts of government where there is an issue as to legal qualification of a person holding office. *Harbaugh v. Winsor*, 38 Mo. 327, 332 (1866).

*Benne*, 106 S.W.3d at 599. Because we otherwise conclude that Hickory Neighbors cannot privately challenge whether commissioners on the CWC were serving unlawfully pursuant to an unconstitutional statute, we need not further address application of the *de facto* doctrine to the decision of the CWC at issue in this appeal.

Point Two is denied.

## Point Three

In its third point on appeal, Hickory Neighbors alleges that because section 644.021.1 as amended in 2016 is unconstitutional, the version of the statute in effect before its amendment controls. Hickory Neighbors alleges that the four commissioners appointed to the CWC in October and December 2017 were not lawfully appointed pursuant to that earlier version of the statute.

For the reasons explained in connection with our discussion of point two on appeal, Hickory Neighbors has no authority to privately challenge whether commissioners were lawfully appointed to the CWC.

Point Three is denied.

## Point Four

In its fourth point on appeal, Hickory Neighbors alleges that the CWC erroneously denied its motion to continue consideration of the AHC's recommended decision from the CWC's December 12, 2017 meeting agenda. Hickory Neighbors argues that the CWC

16

erroneously applied the law when it concluded that pursuant to section 621.250.3, it had no authority to grant a continuance given Trenton Farms' objection to Hickory Neighbors' motion.

Section 621.250.3 provides, in pertinent part, as follows:

Within fifteen days after the [AHC] renders a recommended decision, it shall transmit the record and a transcript of the proceedings, together with the [AHC's] recommended decision to the commission having authority to issue a final decision [here, the CWC]. The final decision of the [CWC] shall be issued within one hundred eighty days of the date the notice of appeal in subsection 2 of this section is filed and shall be based only on the facts and evidence in the hearing record; provided, however, that the date by which the [CWC] is required to issue a final decision may be extended at the sole discretion of the permittee as either petitioner or intervenor in the appeal.

Hickory Neighbors filed its appeal to the AHC on December 23, 2016.[13] One hundred eighty days from that date was June 21, 2017. However, by that date, the AHC had not yet rendered its recommended decision. Trenton Farms consented to an extension of time for the AHC to issue its recommended decision. Hickory Neighbors argues that as a result, Trenton Farms waived the 180-day deadline for issuance of a final decision by the CWC, rendering it legally erroneous for the CWC to rely on Trenton Farms' objection to deny Hickory Neighbors' motion for continuance.

Hickory Neighbors' argument ignores that the extension consented to by Trenton Farms in the appeal before the AHC was actually controlled by section 621.250.2, and not section 621.250.3. Section 621.250.2 requires the AHC to hold hearings "[w]ithin ninety days after the date on which the notice of appeal is filed" in the AHC, and to issue a

---

[13] Hickory Neighbors' appeal was file stamped on December 23, 2016, though it appears to have been electronically transmitted on December 22, 2016.

recommended decision "within one hundred twenty days after the date on which the notice of appeal is filed." Section 621.250.2 further provides that these deadlines "may be extended at the sole discretion of the permittee as either petitioner or intervenor in the appeal." Thus, when Trenton Farms agreed to an extension of time in the AHC proceedings, it was doing so pursuant to section 621.250.2, and not section 621.250.3.[14] Nothing in section 621.250.2 suggests that a permittee's willingness to consent to an extension before the AHC forecloses the permittee's right in its sole discretion to refuse to consent to extensions before the CWC pursuant to section 621.250.3.

Although the practical effect of Trenton Farms' consent to an extension of deadlines before the AHC was to ensure that the CWC could not issue a final decision until more than 180-days after Hickory Neighbors filed its appeal to the AHC, the CWC's authority to extend deadlines pursuant to section 621.250.3 nonetheless remained subject to Trenton Farms' sole discretion to refuse to consent. Trenton Farms agreed to an extension, in its sole discretion, as to permit the CWC to consider the AHC's recommended decision on its December 6, 2017 agenda, and then again as to permit the CWC to consider the AHC's recommended decision on its December 12, 2017 agenda. However, Trenton Farms did not, as a result, relinquish its plain statutory right to object in its sole discretion to further extensions. There is no language in section 621.250.3 which suggests that once a permittee consents to an extension, the permittee waives the right to refuse to consent to further

_____

[14]Trenton Farms ultimately consented, in writing, to an extension to August 31, 2017 to permit the AHC to issue its recommended decision.

18

extensions. The CWC did not erroneously deny Hickory Neighbors' motion for continuance given Trenton Farms' objection to same.

Even if the CWC did erroneously rely on Trenton Farms' objection to deny Hickory Neighbors' motion for a continuance, (which we do not hold), we would nonetheless conclude that Hickory Neighbors' fourth point on appeal is without merit. "The denial of a continuance is rarely reversible error." *Seabaugh v. Milde Farms, Inc*., 816 S.W.2d 202, 207 (Mo. banc 1991). For error to warrant relief, the error must be prejudicial. *See Harris v. Desisto*, 932 S.W.2d 435, 441 (Mo. App. W.D. 1996) (denying appellant's claim of error based on trial court's denial of a motion for continuance where error, if any, "was not prejudicial error" because a continuance would not have afforded the appellant a trial on the merits).

Hickory Neighbors has not even attempted to explain how it was prejudiced by the CWC's denial of its motion for continuance. *See City of Bridgeton v. City of St. Louis*, 18 S.W.3d 107, 113 (Mo. App. E.D. 2000) (denying claim of error based on trial court's denial of a motion for continuance where the appellant "fail[ed] to show how it was prejudiced . . . by the courts [sic] denial of its motion for continuance"). We independently conclude that a continuance would not have impacted the CWC's decision. Pursuant to section 621.250.3, the CWC's consideration of the AHC's recommended decision on December 12, 2017 was required to "be based only on the facts and evidence in the [AHC's] hearing record." Whether that consideration occurred on December 12, 2017, or on some later date, the facts and evidence in the AHC's hearing record would have been the same. Though Hickory Neighbors would have been permitted to make an oral statement to the

19

CWC at the time it considered the AHC's recommended decision, there is no reasoned basis to believe that such a statement would have altered the CWC's decision.

The CWC did not commit legal error in denying Hickory Neighbors' motion for continuance, and even had it, Hickory Neighbors was not prejudiced by the error.

Point Four is denied.

## Point Five

In its fifth point on appeal, Hickory Neighbors argues that the CWC's decision to accept the AHC's recommended decision is unenforceable because Commissioners Coday, Kleiboeker, and Thomas had disqualifying conflicts of interest such that their participation in the CWC's decision deprived Hickory Neighbors of due process.[15]

Hickory Neighbors' fifth point on appeal is not preserved with respect to the claim that Commissioner Thomas had a disqualifying conflict of interest. Hickory Neighbors' motion to disqualify commissioners filed on December 11, 2017 did not identify Commissioner Thomas as a commissioner alleged to have a disqualifying conflict of interest. Hickory Neighbors did not otherwise make a record before the CWC to suggest that Commissioner Thomas possessed a disqualifying conflict of interest. We are not

---

[15]Hickory Neighbors' second and third points on appeal challenged whether certain commissioners were lawfully serving on the CWC. As we have explained, these challenges were required to be asserted in a quo warranto action, as they relate to whether commissioners had the lawful power to act at all. In contrast, Hickory Neighbors' fifth point on appeal does not challenge whether commissioners were lawfully serving on the CWC, and only challenges whether commissioners were disqualified from participating in the vote on the Trenton Farms CAFO because of alleged conflicts of interest. The challenge asserted in Hickory Neighbors' fifth point on appeal is not required to be asserted in a quo warranto action. Quo warranto "is not to be used to prevent an improper exercise of power lawfully possessed," and instead is to be used "solely to prevent an officer or corporation of persons purporting to act as such from usurping a power which they do not have." *State ex inf. Dykhouse*, 509 S.W.3d at 151 (quoting *State ex inf. McKittrick*, 148 S.W.2d at 530).

20

permitted to entertain that claim here.[16]  Sitting as a court with original jurisdiction to conduct judicial review of a contested case pursuant to section 536.140, we are limited to review of the agency action "upon the petition and the record filed."  Section 536.140.2. "[I]n a contested case the private litigant must try his or her case before the agency, and judicial review is on the record of that administrative trial."  *City of Valley Park v. Armstrong*, 273 S.W.3d 504, 507 (Mo. banc 2009).  Limited authority is extended by section 536.140.4 permitting a court on judicial review to entertain additional evidence, or to remand the case to the agency with directions to reconsider the same in light of new evidence.  However, the provisions of section 536.140.4 are not applicable here, as Hickory Neighbors has neither argued nor demonstrated that the complaint it now raises about Commissioner Thomas involved evidence that could not have been produced in the exercise of reasonable diligence, or that was improperly excluded, in the administrative proceedings before the CWC.  *See Johnston v. Livingston County Comm'n.*, 462 S.W.3d 859, 866 (Mo. App. W.D. 2015).  Hickory Neighbors' fifth point on appeal is denied with respect to Commissioner Thomas.

Hickory Neighbors' fifth point on appeal is moot with respect to Commissioner Kleiboeker.  Hickory Neighbors' motion to disqualify Commissioner Kleiboeker argued that his volunteer service on the Board of Directors of the Missouri Soybean Association create the appearance of a conflict of interest.  The CWC denied the motion to disqualify

---

[16]In support of its point relied on alleging disqualifying conflicts of interest, Hickory Neighbors has improvidently included materials in a supplemental legal file and in its appendix that were not a part of the record before the CWC.  In addressing Hickory Neighbors' fifth point on appeal, we have not considered any materials that were not a part of the record before the CWC.

after Commissioner Kleiboeker confirmed on the record that his position on the Board of Directors of the Missouri Soybean Association would not affect his ability to render an impartial decision. [ROA p. 1725]. However, though Commissioner Kleiboeker initially participated in the CWC hearing by telephone, he was no longer participating in the hearing by telephone by the time the CWC voted to accept the AHC's recommended decision. [ROA pp. 1761-62]. As a result, Commissioner Kleiboeker did not participate in the vote, and was not one of the four commissioners who voted to accept the AHC's recommended decision. Review of the CWC's denial of Hickory Neighbors' motion to disqualify Commissioner Kleiboeker thus presents a matter that will not have any practical effect upon an existing controversy, the definition of mootness. *Bank of Washington v. McAuliffe*, 676 S.W.2d 483, 487 (Mo. banc 1984). Even were we inclined to find that the CWC erred in denying Hickory Neighbors' motion to disqualify Commissioner Kleiboeker (which we are not, for reasons explained, *infra*), we would not find the CWC's decision to accept the AHC's recommended decision to be unenforceable as a result, since Commissioner Kleiboeker did not participate in the vote. Hickory Neighbors' fifth point on appeal is denied with respect to Commissioner Kleiboeker.

We are left with Hickory Neighbors' claim that Commissioner Coday had a disqualifying conflict of interest. In the motion to disqualify filed with the CWC on December 11, 2017, Hickory Neighbors alleged that "Commissioner Coday is the President of the Wright County Farm Bureau, an affiliate of the Missouri Farm Bureau." [ROA p. 1663]. Hickory Neighbors alleged that "a reasonable person would find an underline appearance of underline possible conflict of interest concerning the participation of Commissioner[] . . . Coday . . .

22

. [as] [i]f allowed to participate, Commissioner[] . . . Coday . . . would be voting on a matter in which [his] . . . organization[], . . . the Missouri Farm Bureau . . . has affirmatively taken a policy position, specifically whether Trenton Farms should be issued a general state operating permit." [ROA p. 1664] (emphasis in original). Hickory Neighbors argued that Commissioner Coday was acting in a quasi-judicial capacity, and was subject to Supreme Court Rule 2-2.11, requiring a judge to recuse "in any proceeding in which the judge's impartiality might reasonably be questioned." [ROA pp. 1664-65]. Hickory Neighbors' motion to disqualify did not argue that Commissioner Coday was *actually* biased, and instead only argued that an appearance of impropriety required Commissioner Coday to recuse.

As was the case with Commissioner Kleiboeker, after Commissioner Coday confirmed on the record that his position with Wright County Farm Bureau would not affect his ability to render an impartial decision, the CWC voted to deny Hickory Neighbors' motion to disqualify Commissioner Coday. [ROA p. 1724]. This was neither legally erroneous, nor an abuse of discretion. In *State ex. rel. Praxair, Inc. v. Missouri Pub. Serv. Comm'n*, 344 S.W.3d 178, 189 (Mo. banc 2011), our Supreme Court addressed a claim that commissioners on the Public Service Commission were disqualified and should have recused because their meeting with utility officials created an appearance of impropriety. Public Counsel moved to disqualify the commissioners, and argued that because the commissioners were acting in a quasi-judicial capacity they were subject to the canons of judicial conduct, including the canon requiring recusal when a reasonable person

23

might question the judge's impartiality.  *Id*. at 190.  The Supreme Court disagreed, and held:

> There is some surface appeal to Public Counsel's argument in that the PSC does perform in a quasi-judicial function when it acts in an adjudicative capacity.  But PSC commissioners are members of the executive branch, not the judicial branch.  While they act in a quasi-judicial capacity at times–and at other times act in a regulatory capacity–they are not judges.  They are members of an executive branch administrative commission.  As such, the judicial canons do not apply to them, for, as expressly stated in the preamble to the code, "The text of the Canons is intended to govern *conduct of judges* and to be binding *upon them*."  *Rule 2.01 Preamble to Missouri Code of Judicial Conduct*.

*Id*. (emphasis in original).

*State ex. rel. Praxair, Inc.* is controlling.  Hickory Neighbors' argued basis for disqualifying Commissioner Coday, an appearance of a possible conflict of interest, depended for its success on applying the canons of judicial conduct to the commissioners on the CWC.  The commissioners on the CWC are members of an executive branch administrative commission.  They are not judges, even though they at times act in a quasi-judicial capacity.  As was the case in *State ex. rel. Praxair, Inc.*, "[t]he [CWC] commissioners are not governed by the canons of judicial conduct and, thus, are not bound by the proscription of Canon 2 that a judge must avoid . . . the appearance of impropriety." *Id*. at 191.  "[Hickory Neighbors' motion to disqualify] does not cite any authority other than the judicial canons . . . for its argument that the appearance of impropriety is itself a sufficient basis on which to base disqualification of an administrative office acting in a quasi-judicial capacity." *Id*. (emphasis omitted).  The CWC did not err in denying the motion.

Hickory Neighbors seemingly concedes that the legal basis raised in its motion to disqualify Commissioner Coday is without merit, as in this judicial review proceeding, Hickory Neighbors raises a new legal argument in support of disqualifying Commissioner Coday. Hickory Neighbors' point on appeal relies on principles of due process, and in the argument portion of its Brief, Hickory Neighbors cites to cases for the proposition that "due process principles . . . require . . . a[n] [administrative] tribunal [to] be free of *actual bias* or the *probability of actual bias*." *Id.* (emphasis in original). Indeed, it is a settled principal that unlike the canons of judicial conduct, "[t]he procedural due process requirement of fair trials by fair tribunals applies to an administrative agency acting in an adjudicative capacity." *State ex rel. AG Processing, Inc. v. Thompson*, 100 S.W.3d 915, 919 (Mo. App. W.D. 2003). The due process basis for disqualifying a commissioner from participating in a proceeding before an administrative agency thus requires proof of *actual* bias or the probability of *actual* bias, as distinguished from the mere appearance of an impropriety sufficient to require judicial recusal.

Hickory Neighbors did not allege actual bias or the probability of actual bias in its motion to disqualify, and did not argue that Commissioner Coday was required to recuse based on due process principles. As we have previously explained, in our exercise of original jurisdiction to judicially review the CWC's decision pursuant to section 536.140, we are limited to a review of the record before the CWC, and are afforded no authority to hear Hickory Neighbors' new claim or new evidence. *See* section 536.140.1; *City of Valley Park*, 273 S.W.3d at 507; *Johnston*, 462 S.W.3d at 866.

25

Even if Hickory Neighbors could overcome its failure to raise its due process argument with the CWC, we would conclude that Hickory Neighbors' challenge to Commissioner Coday on due process grounds is without merit. "A presumption exists that administrative decision-makers act honestly and impartially, and a party challenging the partiality of the decision-maker has the burden to overcome that presumption." *State ex rel. AG Processing, Inc.*, 100 S.W.3d at 920. Here, Hickory Neighbors motion to disqualify "offered no evidence to show any form of actual bias or personal stake in the [CWC's decision regarding the Trenton Farms' permit] on the part of [Commissioner Coday]. [It] made no showing of commitment made by the commissioner[]" based on his affiliation with Wright County Farm Bureau, or "that the commissioner[] [was] inappropriately exposed to facts that were not later made of record." *State ex rel. Praxair, Inc.*, 344 S.W.3d at 193. Hickory Neighbors presented neither argument nor evidence sufficient to overcome the presumption that Commissioner Coday acted impartially.

Point Five is denied.

## Conclusion

The CWC's decision to accept the AHC's recommended decision sustaining DNR's issuance of a CAFO permit to Trenton Farms is affirmed.[17]

_____
Cynthia L. Martin, Judge

All concur

---

[17]Trenton Farms' pending motions to strike portions of Hickory Neighbors' Brief and appendix, which were taken with the case, are denied as moot.

26