

# In the
# Missouri Court of Appeals
# Western District

| | | |
|---|---|---|
| IN THE MATTER OF: TRENTON FARMS RE, LLC Permit No. MOGS10500, | ) ) ) ) | WD79527 |
| Appellant, | ) ) | OPINION FILED: November 22, 2016 |
| v. | ) ) | |
| MISSOURI DEPARTMENT OF NATURAL RESOURCES, HICKORY NEIGHBORS UNITED, INC., | ) ) ) ) | |
| Respondent. | ) ) | |

**Appeal from the Clean Water Commission**

Before Division Four: Mark D. Pfeiffer, Chief Judge, Presiding, Karen King Mitchell, Judge and Gary D. Witt, Judge

Trenton Farms RE, LLC ("Trenton Farms") appeals the decision of the Missouri Clean Water Commission ("CWC") to deny Trenton Farms' permit application for a swine concentrated animal feeding operation ("CAFO") to be operated in Grundy County, Missouri. Trenton Farms raises five points of error on appeal, four alleging that the CWC erred in its denial because it misinterpreted the permit requirements of 10 CSR 20-

6.010(3)[1] causing the regulation to be misapplied and resulting in violations of Trenton Farms' constitutional rights. Trenton Farms' final point alleges that the CWC erred in finding that Trenton Farms' application did not adequately prove that the CAFO operation was protected from a one hundred-year flood as required by 10 CSR 20-8.300(5)(A).[2] We affirm.

## Factual and Procedural Background

In Missouri, the Clean Water Act ("CWA") is implemented by two administrative agencies: the Missouri Department of Natural Resources ("DNR") and the CWC. The DNR is Missouri's "general environmental agency charged with administering the programs assigned to the Department relating to environmental control and the conservation and management of natural resources." *Mo. Soybean Ass'n v. Mo. Clean Water Comm'n*, 102 S.W.3d 10, 19 (Mo. banc 2003) (internal quotation omitted). The CWC is charged by statute with a number of duties and granted numerous powers including:

> (1) the "general supervision of the administration and enforcement" of the Missouri Clean Water Law, sec. 644.026.1(1); (2) developing "comprehensive plans and programs for the prevention, control and abatement of new or existing pollution of the waters of the state." sec.644.026.1(2); (3) identifying waters of the state and prescribing water quality standards for them, sec.644.026.1(7); (4) the power to promulgate rules and regulations to enforce and implement Missouri's Clean Water Law, and the duties imposed on the state by the CWA, sec.644.026.1(8); and (5) the power to exercise all incidental powers necessary to carry out the purposes of Missouri's Clean Water Law, and to assure that the State of Missouri complies with the CWA, sec.644.026.1(16).

---

[1] All regulatory references to 10 CSR 20-6 are to the Missouri Code of State Regulations (2014) unless otherwise indicated.

[2] All regulatory references to 10 CSR 20-8 are to the Missouri Code of State Regulations (2012) unless otherwise indicated.

2

*Id.* at 19 n.15. The CWC's "domicile" is within the DNR. Section 644.021.1. DNR reviews all applications for CAFOs and determines eligibility for permits. 10 CSR 20-6.010(2). Such decisions, however, are reviewed by the CWC and the CWC acts as the final deciding agency regarding whether an applicant will or will not receive a permit. Section 644.026.1.

On April 6, 2015, Trenton Farms applied to the DNR[3] for a state no-discharge operating permit for a swine CAFO ("Permit Application"). The Permit Application was reviewed by DNR employee Greg Caldwell ("Caldwell"). Caldwell determined that the Permit Application met all statutory and regulatory requirements and, on August 12, 2015, DNR issued Permit MOGS10500 ("Permit") to Trenton Farms to operate the requested swine CAFO.

Hickory Neighbors United, Inc. ("Hickory Neighbors") filed a Petition for Appeal of the Permit to the Administrative Hearing Commission ("AHC") on August 28, 2015, and a subsequent Amended Petition for Appeal ("Amended Petition") on September 22, 2015. Trenton Farms intervened in the AHC action, and the AHC held a hearing on Hickory Neighbors' Amended Petition on October 23, 2015. The AHC found that DNR met its burden of showing that the operating permit was issued in accordance with applicable laws and recommended that the grant of the Permit be upheld ("Recommended Decision"). The Recommended Decision was transmitted to the CWC on January 4, 2016. The CWC heard additional oral argument from the parties on February 17, 2016, issuing

---

[3] The DNR staff in the Division of Environmental Quality, Water Protection Program, are responsible for administering the Missouri Clean Water Law, including issuing CAFO permits. 10 CSR 20-1.010(3). The CWC, which is ultimately charged with conserving Missouri's waterways, maintains oversight over the permits and is the agency ultimately responsible for the final granting or denying of a CAFO permit. 10 CSR 20-1.020.

3

its Final Decision on February 24, 2016 ("Final Decision"). The CWC disagreed with the ultimate findings of the AHC, instead finding that the Permit was not appropriately and lawfully issued to Trenton Farms because DNR failed to determine that Trenton Farms was a "continuing authority," as required by 10 CSR 20-6.010(3), and further that DNR failed to adequately determine that the swine CAFO would be protected in the event of a one hundred-year flood in accordance with 10 CSR 20-8.300(5)(A). The Final Decision by the CWC overruled the DNR's grant of the Permit to Trenton Farms. This appeal followed.

**Standard of Review**

Section 644.051.6 provides that decisions by the CWC shall be subject to appellate review pursuant to chapter 536 of the Missouri Administrative Procedure Act. Section 536.140.2 provides that, on review, this Court may determine whether the action of the agency: (1) violates a constitutional provision; (2) is in excess of statutory authority or jurisdiction of the agency; (3) is unsupported by competent and substantial evidence upon the whole record; (4) is unauthorized by law; (5) is made upon unlawful procedure or without a fair trial; (6) is arbitrary capricious or unreasonable; or (7) involves an abuse of discretion.

We give deference to the agency's findings of fact so long as they are supported by competent and substantial evidence. *Bd. of Educ. of City of St. Louis v. Mo. State Bd. of Educ.*, 271 S.W.3d 1, 7, 12 (Mo. banc 2008). As to questions of law, this Court conducts its review *de novo*. *Albanna v. State Bd. of Registration for Healing Arts*, 293 S.W.3d 423, 428 (Mo. banc 2009); *ITT Commercial Fin. Corp. v. Mid-America Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc 1993).

4

## Discussion

## I.

As it is dispositive of this appeal, we will first discuss Trenton Farms' final Point Relied On. In Point Relied On V, Trenton Farms alleges that the CWC erred in denying the Permit in that "there was no evidence in the record that the barns were not protected from inundation by the 100-year flood."[4]

The Manure Storage Design Regulations, which apply to this type of CAFO operation, require that "[m]anure storage structures, confinement buildings, open lots, composting pads, and other manure storage areas in the production area shall be protected from inundation or damage due to the one hundred-year flood." 10 CSR 20-8.300(5)(A). This protection may be accomplished by constructing all listed sites above the one hundred-year flood plain or by including with the permit application certification from an engineer that all relevant sites are protected.

Trenton Farms argues that there was sufficient evidence presented to the CWC to support a conclusion that the manure management barns of the CAFO were adequately

---

[4] We agree with Hickory Neighbors that, as drafted, the Point Relied On incorrectly states the burden of proof. It was not the burden of Hickory Neighbors or the CWC to show that there was "no evidence" that the barns were "not protected" but rather the regulations require that a permit applicant and the DNR bear the burden of affirmatively proving that certain portions of the CAFO facility are protected against a one hundred-year flood. *See* 10 CSR 20-8.300(5)(A). Despite the wording of the Point Relied On, Trenton Farms is ultimately raising a challenge to the CWC's finding that the engineer's certificate filed with the Permit Application was insufficient to meet the burden of Trenton Farms and the DNR in demonstrating that the CAFO operation was adequately protected. Thus, we need not enter into a detailed discussion of the burden of proof applicable to each of the parties.
  We further note that Hickory Neighbors' Amended Petition challenged the validity of the Permit because Trenton Farms failed to comply with the requirements of Executive Order 98-03, as opposed to 10 CSR 20-8.300(5)(A). The AHC's Recommended Decision held that 10 CSR 20-8.300(5)(A) was promulgated for the purposes of implementing Executive Order 98-03 to CAFOs. As such, the AHC interpreted Hickory Neighbors' allegation that Trenton Farms failed to meet the requirements of Executive Order 98-03 as an allegation that Trenton Farms failed to meet the requirements of 10 CSR 20-8.300(5)(A). The CWC appears to have adopted this interpretation and Trenton Farms does not raise the issue on appeal. Thus, we too review the parties arguments as they relate to the properly adopted rule 10 CSR 20-8.300(5)(A).

protected from a one hundred-year flood. First, Trenton Farms relies on the testimony of Caldwell who reviewed the Permit Application on behalf of DNR. Caldwell testified that Trenton Farms submitted a map with the application showing the flood plain but it was difficult to determine where the buildings would be placed on that map. He also noted that the flood boundary map crossed topographical lines, which prevented him from determining whether the CAFO was located within flood boundary lines based strictly on the map submitted. As a result, he obtained a FEMA map and a soil data map to determine that the CAFO was not actually located within the one hundred-year flood plain. He testified that his determination was based solely on the three additional maps that he obtained and which were entered into evidence by DNR. Unfortunately, as noted by Hickory Neighbors, the maps identified and entered into evidence by the DNR and allegedly relied upon by Caldwell are from counties other than Grundy.[5] Ultimately, although the AHC found that Caldwell was credible, it found that his conclusions merely went to the issue of flooding of the soil and were not actually dispositive of the issue of whether the CAFO project was located in a FEMA Zone A floodplain.

---

[5] It appears that these maps are wholly unrelated to the Grundy CAFO site and call into question Caldwell's testimony. When the discrepancy was pointed out to Caldwell he responded that he did not know why the maps were from different counties and that the "map unit [he] clicked on in there was in Grundy County." It was possible that map was part of a series that included multiple counties. Caldwell testified that he used topographic lines as well as the "identify tool" that was part of the map to confirm that it was in Grundy County as well as the map numbers which corresponded to Grundy County. It is not clear whether Caldwell incorrectly relied on maps from surrounding counties or the wrong maps were printed and submitted as exhibits. The AHC accepted the map exhibits as offered subject to objection from Hickory Neighbors noting that "[the Commission's] initial thought is that he has testified that he relied on those documents and, therefore, for what they are worth," they are admitted. We find that we need not resolve the discrepancy between the locations of the maps, however, because the AHC found--and the CWC agreed--that Caldwell's testimony was not dispositive of the ultimate issue of floodplain location.

Grundy County Emergency Management Director, Glen Briggs ("Briggs"), submitted an affidavit in support of Trenton Farms stating that he concluded that the CAFO building site is not located in the FEMA Zone A floodplain--also known as a one hundred-year floodplain. The AHC, however, noted that the orientation of the buildings on the map examined by Briggs did not match the building site plan submitted by Trenton Farms and, thus, found his conclusions to be irrelevant.

The final source of evidence that the CAFO was adequately protected from a one hundred-year flood came from the certification of the Permit Application. As part of the application, Todd Van Maanen ("Van Maanen"), a Missouri licensed civil engineer, certified that, to the best of his knowledge, information and belief, "the manure management and containment system is designed in general conformance with applicable laws, codes, and regulations as of the date of signing." The AHC found that Caldwell and DNR were entitled to rely on this certification to find that the CAFO complied with 10 CSR 20-8.300(5)(A) and ultimately found this certification was sufficient evidence for DNR to conclude that Trenton Farms complied with the regulation.

The CWC agreed with the AHC's findings as to the testimony of Caldwell and Briggs[6] but disagreed as to the AHC's conclusions regarding the engineer's certification. While the AHC interpreted the certification to mean that Van Maanen certified the CAFO buildings were protected from inundation or damage due to a one hundred-year flood, the

---

[6] The CWC also agreed with the AHC's finding that the testimony of Hickory Neighbors' engineer, Kathy Martin, did not conclusively establish that the proposed CAFO buildings were located in the one hundred-year floodplain. Since the CWC ultimately found that Trenton Farms had no evidence to show compliance with 10 CSR 20-8.300(5)(A), and it bore the burden of showing compliance, we need not discuss Martin's testimony.

7

CWC found that his certification did not go nearly so far. The CWC found that the engineer's certification and seal were attached only to the documents titled "Gestation Facility Manure Productions & Storage Calculations, Farrowing Facility Manure Production & Storage Calculations, and Gilt Development Facility Manure Production & Storage Calculations." Thus, the engineer's certification could only be interpreted to state that Van Maanen certified that the Production and Storage Calculations of the manure management and containment system complied with the applicable laws, codes and regulations. There was no evidence to suggest that Van Maanen intended to certify the compliance of all CAFO buildings and operations location as to the one hundred-year floodplain.

Further, as Hickory Neighbors notes in its brief, the certification only states that the certification applies to "the manure management and containment system." 10 CSR 20-8.300(5)(A) requires evidence that the manure storage structures be protected, but also that there be protection for "confinement buildings, open lots, composting pads, and other manure storage areas in the production area." Even were we not mandated to give deference to the CWC's findings of fact regarding the breadth of the certification, we note that there is no evidence in the Petition Application to support a finding that Trenton Farms complied with the flood protection for these other areas or, in the alternative, evidence that this particular swine CAFO did not include such other areas and thus no certification of protection was needed. Trenton Farms repeatedly argues that there is nothing in the record that would indicate that the certification did *not* apply to the design of the entire facility, thus the CWC was erroneous in deciding that it did not meet the requirements of 10 CSR

8

20-8.300(5)(A). This argument ignores the plain language of the engineer's certification, which states it only applies to the "manure management and containment system," making no mention of the other sites required to be protected under the regulation. Without some evidence or testimony that these other sites were similarly protected or not part of the CAFO, the CWC, as the finder of fact, was free to find the engineer's certification did not fully comply with the regulations.

We give deference to the CWC's findings of fact and will overturn their judgment only if it is unsupported by competent and substantial evidence; is arbitrary, capricious, unreasonable, or involves an abuse of discretion; or the decision is unauthorized by law. *M.A.H. v. Mo. Dept. of Soc. Servs.*, 447 S.W.3d 694, 697 (Mo. App. E.D. 2014). It was not unreasonable for the CWC to make the same findings as the AHC that the testimony presented regarding the floodplain was insufficient to establish that the CAFO would be adequately protected. The maps relied on by Caldwell were suspect because they were identified as representing other irrelevant counties, and the map relied on by Briggs had the buildings oriented differently than the site plan submitted by Trenton Farms. Further, although Trenton Farms interprets the engineer's certification by Van Maanen differently, the CWC's interpretation was not arbitrary, capricious or unreasonable. The clear language of the certification states that "manure management and containment system" conforms to applicable laws, codes and regulations, but makes no mention of the other areas and structures listed in 10 CSR 20-8.300(5)(A). It was also reasonable for the CWC to question why the certification was only attached to the manure containment calculations and not the Permit Application as a whole, if it was indeed intended to apply to the entire Permit--

9

including areas beyond the manure containment system. Under section 327.411.1, the professional seal only applies to "all documents sealed by the licensee." Given that the seal was only affixed to a certain subset of documents, it is reasonable for the fact finder to believe it was not intended to provide a certification to the entire permit. Further, subsection 3 of 327.411 states that a professional licensee may affix his seal "specifying the particular technical submissions, or portions thereof, intended to be authenticated by the seal, and disclaiming any responsibility for all other technical submissions relating to or intended to be used for any part or part of the [project]." In this case, the seal specifically stated it applied to the "manure management and containment center." While it did not expressly disclaim the rest of the Permit Application, it was reasonable for the CWC to interpret this language as an intent by the engineer to limit his certification pursuant to section 327.411.3. How to interpret the certification was soundly within the CWC's discretion. Under these circumstances, this Court cannot overturn the factual determination of the CWC.

Because we find that the CWC did not err in determining that Trenton Farms' Permit Application failed to adequately establish that it was in compliance with 10 CSR 20-8.300(5)(A), whether the CWC properly interpreted the requirements for being a "continuing authority" is immaterial. However, because the record indicates that Trenton Farms may still retain the right to seek a CAFO permit from the DNR, we briefly address the issues raised in the first four points of Trenton Farms' brief.

**II.**

Trenton Farms' first four points on appeal challenge the finding by the CWC that Trenton Farms did not present evidence in its Permit Application that it was a "continuing authority" as required by 10 CSR 20-6.010(3). It argues that this finding was arbitrary, capricious, unreasonable, and an abuse of discretion; was contrary to the law; was constitutionally invalid because it was void for vagueness as applied to Trenton Farms; and was constitutionally invalid because it violated Trenton Farms' right to due process.

"Administrative rules and regulations are interpreted under the same principles of construction as statutes." *McGough v. Dir. of Revenue*, 462 S.W.3d 459, 462 (Mo. App. E.D. 2015). Statutory interpretation is a matter of law which this Court reviews *de novo*. *Albanna*, 293 S.W.3d at 428.

Section 10 CSR 20-6.010(3) provides:

> All applicants for construction permits or operating permits shall show, as part of their application, that a permanent organization exists which will serve as the continuing authority for the operation, maintenance, and modernization of the facility for which the application is made. Construction and first-time operating permits shall not be issued unless the applicant provides such proof to the department and the continuing authority has submitted a statement indicating acceptance of the facility.

"Continuing authority" is not a defined term in the regulations. *See* 10 CSR 20-2.010. Nor does it appear that the term has ever been interpreted by a Missouri court. In the absence of a given definition in a regulation, the word or term will be given its plain and ordinary meaning as derived from a dictionary. *Teague v. Mo. Gaming Comm'n*, 127 S.W.3d 679, 686 (Mo. App. W.D. 2003). "The interpretation and construction of a statute by an agency charged with its administration is entitled to great weight." *Beverly Enters.-Mo. Inc. v.*

11

*Dept. of Soc. Servs., Div. of Med. Servs.*, 349 S.W.3d 337, 352 (Mo. App. W.D. 2008). "However, it is inappropriate to defer to an agency's interpretation of its own regulation that in any way expanded upon, narrowed, or was otherwise inconsistent with the plain and ordinary meaning of the words used in the regulation." *Id.* Regulations should be interpreted reasonably, and absurd interpretations should not be adopted. *Dep't of Soc. Servs. v. Senior Citizens Nursing Home Dist. of Ray Cty.*, 224 S.W.3d 1, 9 (Mo. App. W.D. 2007).

The testimony regarding this Permit revealed that, historically, DNR interpreted the regulations to require only a showing that an entity was a permanent organization to satisfy the "continuing authority" requirements. Financial information has never been required. This was true for both new permits and permit renewals. At the Permit hearing before the AHC, Caldwell testified as follows:

> [Trenton Farms]. Mr. Caldwell, let's talk about the application and the Department's interpretation of the continuing authority regulations and whether or not the finances of each applicant for a permit are relevant. I believe it's your testimony that the Department does not look at the financial wherewithal of any applicants?
>
> [Caldwell]. No.
>
> Q. So all industrial applicants that submit applications for construction permits or operating permits, the Department has never looked at the financial wherewithal or investigated it or asked them to submit any information concerning their finances to the Department of Natural Resources.
>
> A. Not that I'm aware of.
>
> Q. And they never asked any Concentrated Animal Feeding Operation or CAFO to submit any of their balance sheets or other financial information to qualify as a continuing authority?

12

A. Not that I'm aware of.

Q. Even if they did, there are no regulations in the Missouri Clean Water Commission regulations that would instruct you or any other person at the Department of Natural Resources how to evaluate any financial information that's been submitted?

A. No.

Q. And would it be fair to say that any permit that comes up for reissuance after a five-year permit has expired and somebody has to apply to renew a permit, the Department has never asked any industrial or CAFO for any financial information when they renew a permit?

A. No.

Given its historical application, interpreting "continuing authority" to require financial disclosures was arbitrary as applied to Trenton Farms. CWC cannot change interpretations of "continuing authority" without some notice or other action. *See* section 536.010(4).[7] There is no evidence to suggest that this was an erroneous interpretation on behalf of the DNR or a particular employee of the DNR. To the contrary, recent discussion of changes to the regulations reveals a continued acceptance by the DNR and, therefore, the CWC that financial documents are not required submissions to prove "continuing authority." On September 15, 2016, DNR issued an Order of Rulemaking for 10 CSR 20-6.300 on behalf of the CWC and DNR which included comments to the rulemaking. Comment four stated:

> Mr. Stephen Jeffery proposed additional language to 10 CSR 20-6.300(3)(E) that reads, "Balance sheet and income statement for the applicant prepared

---

[7] The required filings to prove "continuing authority" may not rise to the level of a rule under section 536.010(6), because there is no evidence that the interpretation was a printed or published. All evidence, however, indicates that prior to the Final Judgment in this case, all permit seekers attempting to prove they were a "continuing authority" only needed to show proof that they were a permanent entity. The CWC cannot abandon this interpretation and require substantially more and different documentation of Trenton Farms without going through proper procedures to amend its rules. Section 536.021.

13

by a certified public accountant showing the applicant has sufficient assets to serve as a continuing authority in accordance with 10 CSR 20-6.010(3)." This would require that any applicant for a CAFO operating permit submit a balance sheet and an income statement prepared by a certified public accountant as part of its application package. The purpose of requiring these commonly utilized financial documents is for the applicant to provide "proof" that it is financial viable to operate, maintain, and modernize its proposed CAFO facility, as required by the continuing authority rule, 10 CSR 20-6.010(3).

Orders of Rulemaking from Department of Natural Resources, 2016 MO REG TEXT 418316

(NS) (Sept. 15, 2016). In response, the DNR stated:

No changes were made as a result of this comment. Continuing authority requirements are contained in 10 CSR 20-6.010. Discussion of any proposed revisions to continuing authority requirements would need to be addressed during stakeholder meeting(s) for the revision of that regulation.

*Id.* Had a requirement for such balance sheets or financial information already existed in 10 CSR 20-6.010(3), one would have expected the DNR to acknowledge such. Instead, the DNR recognized that this would be a revision to the existing requirements, requiring time for comment and revision of that particular regulation. While it appears that these comments were made by the DNR, they were done on behalf of the CWC, just as the DNR has been responsible for the interpretation of the submission requirements of 10 CSR 20-6.010(3) on behalf of the CWC. Hickory Neighbors asks us to give deference to the CWC's new interpretation of the filing requirements to prove "continuing authority," arguing that the prior interpretation was given by DNR not CWC. This, however, ignores the actual agency structure of DNR and CWC, in which DNR has been given the authority by CWC to both review and issue permits and promulgate rules and regulations governing permits, both on behalf of the CWC. *See Mo. Soybean Ass'n*, 102 S.W.3d at 19. The CWC

14

maintains oversight of these functions but it cannot choose to allow rules and regulations to be promulgated, issued, and implemented for extended periods of time until the CWC chooses to arbitrarily overturn the DNR's interpretation with no warning to the public or DNR and DNR agents, which the CWC has tasked with reviewing permits. Further, it would be disingenuous to then publish the original interpretation of the regulation even after it supposedly decided on a new and expanded interpretation.

Further, to interpret the statute to require a permit applicant to submit the financial records of the "continuing authority" entity reads an additional requirement into the regulation that is not currently present. As written, 10 CSR 20-6.010(3) requires that a permit application "show, as part of their application, that a permanent organization exists which will serve as the continuing authority *for* the operation, maintenance, and modernization of the facility for which the application is made." (emphasis added). "For" has a number of accepted definitions but it is generally a function word used to indicate actions such as "preparation toward;" "in order to be, become or serve as;" "in order to bring about or further;" "with the purpose or object of;" "prerequisite to." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY UNABRIDGED 886 (1993). In this case, it merely identifies the purpose that the continuing authority will serve. While having positive financials may ultimately be required to fulfil that function, evidence of such is not required to *identify* the entity which will serve the function--which is all the regulation requires. Hickory Neighbors and the CWC's interpretation asks this Court to transform "for" into "and" to require not only the identification of the "continuing authority" entity but also evidence that such entity also has the current financial ability to fulfill its future purpose.

15

The CWC did not have the authority to simply reinterpret 10 CSR 20-6.010(3) in a way that would effectively drastically modify its terms. *See Matteson v. Dir. of Revenue*, 909 S.W.2d 356, 360 (Mo. banc 1995). An agency cannot change the plain meaning of a term used simply because it does not reflect the *intent* of the regulation. *See Stiers v. Dir. of Revenue*, 477 S.W.3d 611, 615-16 (Mo. banc 2016) (giving plain meaning to the word "and" despite agency's claim that doing so did not reflect the intent behind the regulation). If an agency desires such a change, it must be done through amending the regulation. *Id.* at 616.

Because we find that CWC's interpretation of "continuing authority" is arbitrary and contrary to the plain and ordinary meaning of the regulation, we need not enter into a review of Trenton Farms' constitutional challenges to CWC's interpretation to finally decide this point.

As noted above, however, because Trenton Farms failed to adequately demonstrate that the entire swine CAFO operation was protected from a one hundred-year flood, as required by 10 CSR 20-8.300(5)(A), the CWC did not err in denying Trenton Farms' Permit Application.

### Motion for Attorneys' Fees on Appeal

Pursuant to Local Rule XXIX, Trenton Farms filed with this Court a Motion for Attorney's Fees and Expenses on appeal. We elected to take the motion with the case. The motion requested that, in the event Trenton Farms prevailed on appeal, this Court award Trenton Farms reasonable attorneys' fees and expenses. Given this Court's affirmance of the Final Decision, Trenton Farms' Motion for Attorney's Fees and Expenses is denied.

16

## Conclusion

We find that the CWC did not err in finding that Trenton Farms' Permit Application did not meet the requirements of 10 CSR 20-8.300(5)(A) and, therefore, Trenton Farms was not entitled to receive a permit for its purposed swine CAFO.  We affirm.

_____
Gary D. Witt, Judge

All concur