IN THE MISSOURI COURT OF APPEALS
 WESTERN DISTRICT

 IN THE MATTER OF: PVC )
 MANAGEMENT II, LLC, PERMIT NO. )
 MOGS10560 )
 )
 )
 OPPONENTS OF COOPER COUNTY )
 CAFOs, LLC, )
 ) WD82525
 Appellant, )
 v. ) OPINION FILED:
 ) March 30, 2021
 )
 MISSOURI DEPARTMENT OF )
 NATURAL RESOURCES and )
 MISSOURI CLEAN WATER )
 COMMISSION, )
 )
 Respondents. )

 Appeal from the Clean Water Commission

 Before Division Three: Karen King Mitchell, Presiding Judge, and
 Gary D. Witt and Anthony Rex Gabbert, Judges

 Opponents of Cooper County CAFOs, LLC (OCCC) seeks review of the Missouri Clean

Water Commission’s Final Decision approving the Missouri Department of Natural Resources

(DNR)’s issuance of General Operating Permit MOGS10560 (the Permit) to PVC Management

II, LLC (PVC II) for a concentrated animal feeding operation (CAFO) in Cooper County,
Missouri (the Tipton East CAFO). OCCC raises four points on appeal.1 In Points II, III, and IV,

OCCC argues that the Commission erred in approving the Permit because (1) the Missouri

Geological Survey (MGS) did not investigate whether the Tipton East CAFO would present a risk

to the regional drinking water aquifer and did not determine whether groundwater monitoring

should be required (Point II); (2) the Permit authorizes the placement of pollutants where they are

reasonably certain to cause pollution of waters of the State (Point III); and (3) issuance of the

Permit was arbitrary, capricious, unreasonable, an abuse of discretion, and was unsupported by

competent and substantial evidence in that approval ignores evidence showing site conditions

present a significant risk to surface water, groundwater, and the regional drinking water aquifer

(Point IV). For Point V, OCCC argues that the Commission erred in denying a motion to

disqualify Commission Chair Ashley McCarty for bias because she engaged in activities which

she knew or should have known provided a direct benefit to PVC II. Because the only error found

relates to the failure to comply with a procedure set out in a regulation that has since been

amended, and because, in light of this regulatory change, reversing and remanding for

reconsideration of the Permit would be futile, we affirm.

 Background2

 PVC II applied for a general operating permit for the Tipton East CAFO on January 31,

2018. According to the permit application, the Tipton East CAFO would have 1,080 swine over

55 pounds in a farrowing building; 4,704 swine over 55 pounds in a gestation building; and 1,620

 1
 OCCC’s opening brief contains five points relied on, but OCCC subsequently abandoned its first point.
To avoid confusion, we refer to the remaining four points raised on appeal by their original designation—Points II
through V.
 2
 We review the evidence and all reasonable inferences in the light most favorable to the Commission’s
decision. Chipperfield v. Mo. Air Conservation Comm’n, 229 S.W.3d 226, 234 (Mo. App. S.D. 2007).

 2
swine over 55 pounds and 324 swine under 55 pounds in a gilt development unit. Based on the

total number of intended swine, the Tipton East CAFO would be classified as a Class 1C CAFO.

 The application also indicated that the Tipton East CAFO would be a no-discharge

operation and an export-only operation.3 The facility would have a manure storage capacity of

365 days, more than double the number of days required. All manure generated at the facility

would be stored in formed concrete pits.4 And the application included a certification from a

Missouri-licensed professional engineer that the manure management and containment system at

the Tipton East CAFO would be designed in compliance with all applicable laws. MGS, which

is part of DNR, did not make a groundwater monitoring determination before DNR issued the

Permit.

 DNR received all required information from PVC II, reviewed that information, deemed it

complete, and issued the Permit on June 19, 2018. The Permit is a no-discharge operating permit,

which means that any discharge of water contaminants from the permitted operation to waters of

the State would violate the Permit and could subject PVC II to enforcement. The Permit also states

that the Tipton East CAFO is an export-only operation, meaning that manure generated by the

facility will be used to fertilize agricultural fields that PVC II does not own or control.

 OCCC timely filed a complaint with the Administrative Hearing Commission (AHC),

challenging issuance of the Permit on several grounds.5 The AHC held an evidentiary hearing on

 3
 “A CAFO is considered no-discharge if the operation is designed, constructed, operated, and maintained
in a manner such that the CAFO will not discharge to waters of the [S]tate.” 10 C.S.R. § 20-6.300(1)(B)15 (2017).
In this context, an export-only operation sells or gives away all of the manure generated at the facility to unaffiliated
landowners who use it to fertilize their crops.
 4
 The design criteria for CAFOs include the following: “A thorough site investigation shall be made to
determine the physical characteristics and suitability of the soil and foundation for the fabricated storage structure”
and “pits must be designed, constructed, and maintained to be watertight.” 10 C.S.R. § 20-8.300(7)(A), (G) (2017).
 5
 Section 640.013, RSMo (2017), grants the AHC authority to hear environmental appeals in accordance
with § 621.250, which, in tandem, transfers to the AHC all authority to hear contested case administrative appeals
granted to the Commission. Sections 621.250.2 and 621.250.3 authorize the AHC to conduct a hearing and send the

 3
September 24, 2018. DNR called Gorden Wray, an environmental specialist in DNR’s Water

Protection Program, who testified that he drafted the Permit after determining that the application

met all applicable requirements.6

 OCCC called several witnesses, including Corinne Bromfield, Doctor of Veterinary

Medicine. Dr. Bromfield testified regarding the Food Animal Residue Avoidance Databank,

which lists 251 drugs approved by the U.S. Food and Drug Administration for use in swine.

According to Dr. Bromfield, when veterinary drugs are metabolized in the liver, they are excreted

in feces; when the drugs are metabolized in the kidneys, the drugs are excreted in urine.

 OCCC offered into evidence the Natural Resource Conservation Service’s “Soil Survey

of Cooper County, Missouri,” and the AHC admitted the Survey over DNR’s objection.

According to the Survey, the soils at and near the Tipton East CAFO are Clafork series soils

susceptible to “shrink-swell,” meaning “[t]he shrinking of soil when dry and the swelling when

wet. Shrinking and swelling can damage . . . building foundations[] and other structures.”

 In addition, the depositions of Registered Geologist Thomas Aley and Professional

Engineer Ivan Cooper were admitted. Aley testified regarding soil characteristics and geological

formations underlying the Tipton East CAFO. Specifically, Aley testified that the geological

setting at and near the Tipton East CAFO is Burlington-Keokuk limestone and “karst,” which he

defined as “a three-dimensional landscape located on and in a soluble rock in which there is

appreciable water movement through dissolved-out openings in the bedrock.” Aley also testified

that, in his professional opinion, the Tipton East CAFO has the potential to contaminate a drinking

record with a recommended decision to the Commission, which makes the final decision under §§ 621.250.3 and
644.051.6. All statutory references are to the Revised Statutes of Missouri (2017).
 6
 In reviewing CAFO operating permit applications, DNR “will not examine the adequacy or efficiency of
the structural, mechanical, or electrical components of the waste management systems, only adherence to rules and
regulations. The issuance of permits will not include approval of such features.” 10 C.S.R. § 20-6.300(2)(E)(1)
(2017).

 4
water aquifer. Cooper testified regarding the administration of veterinary drugs to animals and the

presence of pharmaceutical residues in the excretions of treated animals.

 Following the hearing, the AHC issued a decision recommending that the Commission

sustain DNR’s issuance of the Permit. In its recommended decision, the AHC summarized the

evidence presented by the parties and responded to each argument raised by OCCC, except, of

course, for those arguments based on the Commission’s subsequent consideration of the AHC’s

decision.7

 On January 9, 2019, the Commission held a hearing on the AHC’s recommended decision.

Before voting on the recommended decision, the Commission took up a motion by OCCC to

disqualify Commission Chair McCarty. Commissioner McCarty is the Executive Director of

Missouri Farmers Care (MFC), an organization comprised of agri-businesses and trade groups.8

OCCC’s motion asserts that, in her role as Executive Director of MFC, Commissioner McCarty

sent emails to the Cooper County Commission containing information about the siting of the

proposed Tipton East CAFO and the Cooper County Commission’s consideration of a health

ordinance that would affect the proposed CAFO’s operations. OCCC claims that, by actively

participating in efforts to locate the Tipton East CAFO in Cooper County, Missouri, and lobbying

the Cooper County Commission to reject a health ordinance—which action would provide a direct

benefit to the Tipton East CAFO—Commissioner McCarty was exposed to facts and evidence

regarding the Tipton East CAFO outside the hearing record and was personally involved in a

pending matter. OCCC also contends that, on August 22, 2018, MFC made campaign

 7
 We discuss the AHC’s specific findings, where relevant, in the analysis section of this opinion.
 8
 Section 644.021, the statute creating the Commission and establishing the qualifications and terms of its
members states, in relevant part, “At least two members shall be knowledgeable concerning the needs of agriculture,
industry or mining and interested in protecting these needs in a manner consistent with the purposes of [the Missouri
Clean Water Law].” § 644.021.1. Commissioner McCarty is one of the two current “agriculture, industry, or mining”
members. https://dnr.mo.gov/env/wpp/cwc/index.html#members (last viewed Jan. 29, 2021).

 5
contributions totaling $2,500 to “Citizens to Elect Don Baragary,” the re-election committee of

Cooper County Commissioner Baragary.

 The Commission denied OCCC’s motion to disqualify Commissioner McCarty by a vote

of 4-0 with Commissioner McCarty abstaining. After the vote denying OCCC’s motion,

Commissioner McCarty stated:

 [T]o make clear, my role is to ensure that an opportunity exists in counties
 so that agriculture can grow and thrive.
 My role is not to advocate for, defend, nor promote any individual
 operation, farm, nor permittee that would qualify in this case and all others, in that
 while working in this case in Cooper County to ensure that Cooper County did not
 enact additional regulations that were burdensome on agriculture, it did not involve
 my role in advocating for PVC II or any other permittee at that time. And . . . that
 support for a county commissioner did not equate to support for this permittee or
 any other.
 And in my work role, I work hard to maintain that I have two hats that I
 wear, one as a citizen, service here on the Clean Water Commission, and another
 in my work role in Missouri [F]armers [C]are. I am diligent in ensuring that those
 things are separate and that I do not advocate for anything or take any stand on
 anything that would be coming before me on the Clean Water Commission as it has
 in this case with PVC II.9

 The Commission heard testimony from counsel for OCCC and counsel for DNR. Before

considering a motion on the AHC’s recommended decision, the Commissioners had an

opportunity to comment, and Commissioner Coday stated,

 Looking at soils is certainly an important thing and aspect, but again, I think
 that needs to be laid aside, because . . . that really, as far as our purview as the Clean
 Water Commission, I believe legally that is outside the scope of our commission.
 And so I believe it’s important for us—the last permit hearing that we had,
 whether we agreed or not, we were very conscious of what the AHC had done, what
 they had looked at as far as the legality of the permit and what DNR had done.

 9
 Before voting on a motion to adopt the AHC’s recommended decision, Commissioner McCarty addressed
the issue again, stating, “I have nothing to gain on the support nor denial of this permit and am able to be unbiased in
my assessment and base my decision solely upon the record.”

 6
 The Commission voted 4-1 to adopt the AHC’s recommended decision with

Commissioners McCarty, Coday, Rowland, and Thomas in favor and Commissioner Reece

opposed.10 OCCC filed a petition for judicial review with this Court under § 644.051.6.

 Standard of Review

 We defer “to the [clean water commission]’s findings of fact and will overturn [the

commission’s] judgment only if it is unsupported by competent and substantial evidence; is

arbitrary, capricious, unreasonable, or involves an abuse of discretion; or the decision is

unauthorized by law.” In re Trenton Farms RE, LLC v. Hickory Neighbors United, Inc., 603

S.W.3d 286, 296 (Mo. banc 2020) (quoting In re Trenton Farms RE, LLC v. Mo. Dep’t of Nat.

Res., 504 S.W.3d 157, 163 (Mo. App. W.D. 2016)). We “presume[] the clean water commission’s

decision is valid, and the burden is on [the challenger] to overcome [the decision’s] presumptive

validity.” Id.

 We review questions of law de novo, including issues of statutory interpretation. Li Lin v.

Ellis, 594 S.W.3d 238, 241 (Mo. banc 2020).

 Analysis

 OCCC raises four points on appeal. In Points II, III, and IV, OCCC argues that the

Commission erred in approving the Permit because (1) MGS did not investigate whether the

nearby spring, drinking water wells, karst geology, and shrink-swell characteristics of the Clafork

soils present a risk to the regional drinking water aquifer and did not determine whether

groundwater monitoring should be required (Point II); (2) the Permit authorizes the placement of

pollutants where they are reasonably certain to cause pollution of waters of the State through

surface runoff and groundwater seepage (Point III); and (3) issuance of the Permit was arbitrary,

 10
 “All final orders or determinations or other final actions by the [C]ommission shall be approved in writing
by at least four members of the [C]ommission.” § 644.066.3(3).

 7
capricious, unreasonable, an abuse of discretion, and is unsupported by competent and substantial

evidence in that approval ignores evidence showing the severe soil and hydrological limitations

at the site present a significant risk to surface water, groundwater, and the regional drinking water

aquifer (Point IV). For Point V, OCCC argues that the Commission erred in denying a motion to

disqualify Commissioner McCarty for bias because she engaged in activities which she knew or

should have known provided a direct benefit to PVC II.

 A. The Commission erred in approving the Permit without a groundwater
 monitoring determination by MGS under 10 C.S.R. § 20-8.300(12) (Point II).

 In Point II, OCCC argues that the Commission erred in approving the Permit without a

groundwater monitoring determination by MGS under 10 C.S.R. § 20-8.300(12) (2017). That

regulation stated,

 Groundwater Monitoring. An approved groundwater monitoring program may be
 required around the perimeter of a manure storage site[11] and/or land application
 areas to facilitate groundwater monitoring. The necessity of a groundwater
 monitoring program, which may include monitoring wells and/or lysimeters, will
 be determined by [MGS] on a case-by-case basis and will be based on potential to
 contaminate a drinking water aquifer due to soil permeability, bedrock, distance to
 aquifer, etc. Where MGS has deemed groundwater monitoring necessary, a
 geohydrological site characterization will be required prior to the design of the
 groundwater monitoring program.

The regulation was in effect when PVC II submitted its permit application and when DNR issued

the Permit.12

 11
 The parties agree that the Tipton East CAFO is a manure storage site.
 12
 The AHC rejected OCCC’s argument because 10 C.S.R. § 20-8.300(12) was authorized by § 640.710.1,
which limits groundwater monitoring to larger, Class IA CAFOs, and an administrative agency may not issue a
regulation that is broader than the authorizing statute. Westwood Country Club v. Dir. of Revenue, 6 S.W.3d 885, 887
n.2 (Mo. banc 1999) (“The regulation of course cannot be broader than the statutory language.”); Teague v. Mo.
Gaming Comm’n, 127 S.W.3d 679, 687 (Mo. App. W.D. 2003) (“As a rule, an administrative agency may not
promulgate a regulation that is broader than the authorizing statute.”). The Commission adopted the AHC’s
recommended decision. On appeal, OCCC argues that the Commission erred because 10 C.S.R. § 20-8.300(12) was
promulgated by the Commission under its broad rulemaking authority granted in § 644.026(8), and not by DNR under
the more limited provisions of § 640.710.1.

 8
 “Regulations are interpreted according to the same rules as statutes.” Dep’t of Soc. Servs.,

Div. of Med. Servs. v. Senior Citizens Nursing Home Dist. of Ray Cty., 224 S.W.3d 1, 9 (Mo. App.

W.D. 2007). “In interpreting regulations, the words must be ‘given their plain and ordinary

meaning.’” Id. (quoting Teague v. Mo. Gaming Comm’n, 127 S.W.3d 679, 686 (Mo. App. W.D.

2003)). Accordingly, we look to the plain and ordinary meaning of the words used in 10 C.S.R.

§ 20-8.300(12) to determine the scope of that section.

 In pertinent part, 10 C.S.R. § 20-8.300(12) states, “The necessity of a groundwater

monitoring program . . . will be determined by [MGS] on a case-by-case basis and will be based

on potential to contaminate a drinking water aquifer due to soil permeability, bedrock, distance to

aquifer, etc.”13 Based on the plain and ordinary meaning of the words “will be determined by

[MGS],” we conclude that 10 C.S.R. § 20-8.300(12) required MGS to make a determination

regarding the need for groundwater monitoring at the Tipton East CAFO. Thus, the Commission

failed to follow the procedure set out in the applicable regulation and erred in approving the Permit

without a groundwater monitoring determination by MGS.

 Shortly after the Commission adopted the AHC’s recommended decision on the Permit,

however, amendments to 10 C.S.R. § 20-8.300 that became effective February 28, 2019, removed

subparagraph (12) “Groundwater Monitoring” from that regulation. The current version of

10 C.S.R. § 20-8.300 does not address groundwater monitoring. Thus, if we were to grant Point II

and reverse and remand this matter, the Commission would not be required to obtain a

determination by MGS as to the need for groundwater monitoring and could, and in all probability

 13
 Before the AHC, Wray, DNR’s permit writer, testified to his understanding that 10 C.S.R. § 20-8.300(12)
applied only when a CAFO proposed use of earthen basins or lagoons to store manure, but Wray admitted that the
language of the regulation was not so limited.

 9
would, issue the Permit applying the exact same procedure previously used.14 This court has held

that, even when a procedural error occurred, we will not reverse and remand if a remand would be

useless or futile. In Clifford Hindman Real Estate, Inc. v. City of Jennings, 283 S.W.3d 804, 808

(Mo. App. E.D. 2009), the Eastern District of this court declined to remand the case where the trial

court had erroneously concluded that the petitioner lacked standing but reviewed the merits of his

claim anyway. The court held,

 In cases where trial courts err procedurally by deciding merits where they should
 not, courts of appeal have chosen nevertheless to review the merits when a remand
 would be futile. . . . Here, were we to remand, the trial court would in all probability
 uphold the validity of the ordinance for the same reasons it did in its judgment this
 time, prompting Appellant to appeal the merits of that decision. To avoid this
 inefficient second judgment and appeal where Appellant would not receive a fresh
 look at the merits from the trial court, we will review the legal question decided by
 the trial court.

Id.; see also Estate of Johnson v. Kranitz, 168 S.W.3d 84, 100 (Mo. App. W.D. 2005) (declining

to “engage in [the] futile act” of remanding for “the unnecessary and useless act” of having the

trial court use the precise statutory terminology in denying appellant’s claim where “there is no

doubt as to the court’s justified conclusions in this regard.”). Similarly, remanding this matter to

the Commission based on the failure to comply with a procedural requirement that no longer

exists—10 C.S.R. § 20-8.300(12)—would be futile, and we decline to do so for that reason.

 Point II is denied.

 14
 At oral argument, OCCC noted that Standard Condition 12 of the Permit contains groundwater monitoring
requirements similar to those previously found in 10 C.S.R. § 20-8.300(12) and, on that basis, urged us to reverse and
remand the matter to the Commission to require compliance with Standard Condition 12. However, OCCC did not
raise the issue of compliance with Standard Condition 12 in its briefs because the point of its appeal was to challenge
issuance of the Permit in the first place and not compliance with the terms of the Permit once it was issued. We “will
not consider arguments ‘not contained in the . . . appellant’s brief or in any of its points relied on.’” McSwain v.
Morton, 452 S.W.3d 199, 206 n.4 (Mo. App. W.D. 2014) (quoting Salvation Army, Kan. v. Bank of Am., 435 S.W.3d
661, 670 (Mo. App. W.D. 2014)).

 10
 B. The Commission did not err in approving the Permit without considering the
 potential presence of pharmaceutical residues in manure (Point III).

 For Point III, OCCC asserts that the Commission erred in approving the Permit because it

authorizes the placement of pollutants where they are reasonably certain to cause pollution of

waters of the State through surface runoff and groundwater seepage in violation of § 644.051.

Section 644.051.1(1) makes it unlawful to “cause pollution of any waters of the [S]tate or to place

or cause or permit to be placed any water contaminant in a location where it is reasonably certain

to cause pollution of any waters of the [S]tate.”15 Relying on the testimony of Dr. Bromfield and

Cooper, OCCC argues that manure generated at the Tipton East CAFO will contain

pharmaceutical residues, which could cause water pollution when the manure is land applied.

 OCCC’s argument overlooks the fact that the Tipton East CAFO is an export-only

operation, meaning that all manure generated at the facility will be sold or given away for land

application on fields not owned or controlled by PVC II. With exceptions not applicable here,

application of the manure to lands not owned or controlled by the permittee is beyond the scope

of the CAFO permitting requirements, and future potential discharges associated with such land

application are too speculative to be a basis for denying the Permit.16 Thus, the Commission did

 15
 In its opening brief, OCCC also highlights the following sentence from § 644.051.4:

 The director shall determine if any state or any provisions of any federal water pollution control act
 the state is required to enforce, any state or federal effluent limitations or regulations, water
 quality-related effluent limitations, national standards of performance, toxic and pretreatment
 standards, or water quality standards which apply to the source, or any such standards in the vicinity
 of the source, are being exceeded, and shall determine the impact on such water quality standards
 from the source.
 16
 The AHC rejected OCCC’s argument on the basis of 10 C.S.R. § 20-6.300(3)(G)2.C, which requires that
“manure be analyzed a minimum of once annually for nitrogen and phosphorus content.” The AHC concluded that,
because the CAFO permitting requirements limit DNR’s consideration of manure content to nitrogen and phosphorus,
consideration of pharmaceutical residues is outside the scope of what DNR may consider when deciding whether to
issue a CAFO permit. Neither party addresses the AHC’s conclusion on this point on appeal, and we do not opine
on it either, having identified another ground for resolving OCCC’s Point III.

 11
not err in approving the Permit without considering the potential presence of pharmaceutical

residues in the manure.

 Point III is denied.

 C. The Commission’s decision to adopt the AHC’s recommended decision was based
 on competent and substantial evidence and was not arbitrary, capricious, or an
 abuse of discretion (Point IV).

 In Point IV, OCCC claims that the Commission erred in approving the Permit because the

decision to issue the Permit was arbitrary, capricious, unreasonable, an abuse of discretion, and

unsupported by competent and substantial evidence in that the decision ignored evidence showing

that severe soil and hydrological limitations at the site present a significant risk to surface water,

groundwater, and the regional drinking water aquifer.

 OCCC makes two arguments in support of Point IV. First, OCCC argues that there was

substantial and undisputed evidence of the soil characteristics and geological formations

underlying the Tipton East CAFO, the location of the nearby spring and drinking water wells, and

the risk to the regional drinking water aquifer. The AHC found that OCCC presented credible

evidence that

 karst (permeable) geology along with an open spring and uncapped wells in the
 area of the Tipton East CAFO raise the potential to contaminate a drinking water
 aquifer, and that the ‘shrink-swell’ characteristics of Clafork soils in the area raise
 the potential for cracking and seepage from the concrete manure storage structures.

But the AHC also reviewed the CAFO permitting requirements that DNR must consider and found

that DNR “presented credible evidence, through the application, the [P]ermit[,] and the testimony

of the permit writer that [DNR] received all the required information, reviewed it, ultimately

deemed the application complete, and issued the [P]ermit.”

 Here, the AHC clearly considered and weighed the evidence presented by both sides and

recommended that the Commission sustain DNR’s issuance of the Permit, which the Commission

 12
did for the reasons articulated by the AHC. And, “[e]ven if the evidence supports either of two

findings, this court is bound by the Commission’s factual determination.” Chipperfield v. Mo.

Air Conservation Comm’n, 229 S.W.3d 226, 234 (Mo. App. S.D. 2007). Our review of the record

confirms that the Commission’s decision to adopt the AHC’s recommended decision was based

on competent and substantial evidence.

 Second, OCCC argues that the Commission’s decision was arbitrary and capricious

because Commissioner Coday remarked that, while looking at soil types is “important,” it is

“outside the scope of our commission.”17 OCCC asserts that, by erroneously concluding that he

could not consider soil types, Commissioner Coday based his decision to vote in favor of adopting

the AHC’s recommended decision on “a material error of law.” Further, OCCC argues, had

Commissioner Coday considered the effects of the shrink-swell characteristics of the Clafork

soils, the Commission may have voted to reject the AHC’s recommended decision. And, because

Commissioner Coday’s vote was based on a material error of law, his vote should be disregarded.

We disagree.

 When read in full and in context, it is apparent that Commissioner Coday was simply

acknowledging the task before the Commission, which was to determine whether to adopt the

AHC’s recommended decision sustaining DNR’s decision to issue the Permit. DNR was not

required to consider soil types at the Tipton East CAFO before issuing the Permit, although, as

described in note 4, supra, PVC II must conduct a “thorough site investigation . . . to determine

 17
 Commissioner Coday’s full comment was as follows:

 Looking at soils is certainly an important thing and aspect, but again, I think that needs to
 be laid aside, because . . . that really, as far as our purview as the Clean Water Commission, I believe
 legally that is outside the scope of our commission.
 And so I believe it’s important for us—the last permit hearing that we had, whether we
 agreed or not, we were very conscious of what the AHC had done, what they had looked at as far as
 the legality of the permit and what DNR had done.

 13
the physical characteristics and suitability of the soil and foundation for the fabricated storage

structure.” 10 C.S.R. § 20-8.300(7) (2017). And, while OCCC may be correct that the

Commission, in its discretion, could consider geologic and hydrogeological information—a

determination we do not make—OCCC does not identify, and we did not find, any authority

requiring the Commission to do so. Thus, we disagree with OCCC’s assessment that

Commissioner Coday’s remark reflected “a material error of law” requiring us to disregard his

vote in favor of the AHC’s recommended decision.

 Point IV is denied.

 D. The Commission did not err in denying OCCC’s motion to disqualify
 Commissioner McCarty (Point V).

 For Point V, OCCC argues that the Commission erred in denying Appellant’s motion to

disqualify Commissioner McCarty for bias because she engaged in activities which she knew or

should have known provided a direct benefit to PVC II.

 OCCC claims that, in her capacity as Executive Director of MFC, Commissioner McCarty

lobbied the Cooper County Commission to reject a county health ordinance that would have

imposed requirements on agricultural operations. And, after the Cooper County Commission

voted down the ordinance, MFC made a $2,500.00 campaign contribution to Cooper County

Commissioner Baragary’s re-election committee. In its opening brief, OCCC also takes issue

with an email Commissioner McCarty, as Executive Director of MFC, sent to MFC’s

membership. She then forwarded a copy of the email to Cooper County Commissioner Baragary.

In that email, Commissioner McCarty wrote,

 As you know Moniteau and Cooper counties are designated as Agri-Ready
 Counties. Pipestone Farms[18] had proposed a facility in northern Cooper County
 about a month ago, only to kill the project when an attorney son of one of the
 individuals receiving the neighbor notice threatened to sue without ceasing.
 18
 PVC II is headquartered in Pipestone, Minnesota.

 14
 Now Pipestone has given neighbor notice for a facility near the Cooper/Moniteau
 county line in the Clarksburg area. Two neighbors to that facility have invited in
 the Missouri Rural Crisis Center to host a public meeting to fight the CAFO. Our
 county Commissioners are dedicated to supporting agriculture and opportunity, but
 need local producers to speak up in this situation. I’m asking for you to reach out
 to key, level-headed, well-spoken local leaders who will [attend] the meeting with
 the purpose of refuting some of the emotion and inaccuracies presented in the
 meeting. Even a few people could change the tone of the meeting. Filling the room
 with pro-ag folks would be even better. . . .

OCCC argues that, by lobbying the Cooper County Commission to reject a health ordinance and

then actively working to “change the tone” and “fill[] the room with pro-ag folks” at a “public

meeting to fight the CAFO,” Commissioner McCarty knowingly engaged in actions that she knew

or reasonably should have known would provide a direct benefit to PVC II.

 The Commission’s decision on the AHC’s recommended decision “shall be based only on

the facts and evidence in the hearing record.” § 621.250.3. “There is a presumption that

administrative decisions are made in compliance with applicable statutes,” Stith v. Lakin, 129

S.W.3d 912, 920 (Mo. App. S.D. 2004) (citation omitted), and “it is assumed that an administrative

board considers the evidence and bases its findings thereon until the contrary appears.” Dittmeier

v. Mo. Real Estate Comm’n, 316 S.W.2d 1, 6 (Mo. banc 1958). Permittees bear “the burden of

demonstrating by clear and convincing evidence that the [Commission] failed to fulfill the

statutory requirements.” Stith, 129 S.W.3d at 920. And, while “administrative decision-makers

must be impartial, . . . [a] presumption exists that [they] act honestly and impartially, and a party

challenging the partiality of the decision-maker has the burden to overcome that presumption.”

State ex rel. AG Processing Inc. v. Thompson, 100 S.W.3d 915, 919-20 (Mo. App. W.D. 2003);

State ex rel. Praxair, Inc. v. Mo. Pub. Serv. Comm’n, 344 S.W.3d 178, 191 (Mo. banc 2011)

(finding that administrative tribunals and adjudicators must “be free of actual bias or the

probability of actual bias.”).

 15
 Here, OCCC failed to meet its burden. OCCC does not identify anything in the record that

demonstrates Commissioner McCarty based her decision to adopt the AHC’s recommended

decision on anything other than the evidentiary record before the Commission or that

Commissioner McCarty stood to gain personally from issuance of the Permit. Nor does OCCC

offer any evidence that Commissioner McCarty’s work on behalf of MFC to dissuade the Cooper

County Commission from adopting a health ordinance aimed at agricultural operations and MFC’s

campaign contribution to Cooper County Commissioner Baragary related specifically to PVC II,

the Tipton East CAFO, or any other permit applicant or facility for that matter.

 With respect to the email quoted above, Commissioner McCarty was acting in her role as

the MFC’s Executive Director and, in that role, she encouraged pro-agriculture people to attend a

meeting about the Tipton East CAFO hosted by the Missouri Rural Crisis Center, a meeting that

was not part of DNR’s public comment process for the Permit. In fact, the meeting took place

more than a week before PVC II submitted its permit application to DNR, so it is unlikely that

application was discussed at the meeting. Moreover, OCCC offers no evidence of what was

discussed at the meeting or how Commissioner McCarty’s email actually benefited PVC II or the

Tipton East CAFO.

 Commissioner McCarty’s support for agriculture is consistent with the legislative intent

expressed in the Missouri Clean Water Law. Section 644.011 states that it is public policy to

“conserve the waters of the [S]tate and protect, maintain, and improve the quality thereof for public

water supplies, and for domestic, agricultural, industrial, recreational and other legitimate

beneficial uses.” And § 644.021.1 allows the appointment of at least two Commission members

who “shall be knowledgeable concerning the needs of agriculture, industry or mining, and

 16
interested in protecting these needs in a manner consistent with the purposes of [the Missouri Clean

Water Law].”

 The Commission did not err in denying OCCC’s motion to disqualify Commissioner

McCarty because OCCC failed to overcome the presumption that she acted honestly and

impartially.

 Point V is denied.

 Conclusion

 Because the only error established by OCCC relates to the Commission’s failure to comply

with a procedure for permitting set out in a regulation that has since been amended, and because,

in light of this regulatory change, reversing and remanding for reconsideration of the Permit would

be futile, we affirm.19

 Karen King Mitchell, Presiding Judge

Gary D. Witt and Anthony Rex Gabbert, Judges, concur.

 19
 While this appeal was pending, OCCC filed a motion requesting attorneys’ fees pursuant to § 536.087,
which states, in pertinent part, “A party who prevails in an agency proceeding or civil action arising therefrom, brought
by or against the state, shall be awarded those reasonable fees and expenses incurred by that party in the civil action
or agency proceeding.” § 536.087.1. Because we affirm the Commission’s judgment adopting the AHC’s
recommended decision that the Commission sustain DNR’s issuance of the Permit, OCCC is not a prevailing party
and, therefore, its motion for attorneys’ fees is denied.

 17